Anthony M. Barnes (SBN 199048)
Erica A. Maharg (SBN 279396)
Email: eam@atalawgroup.com
AQUA TERRA AERIS LAW GROUP
4030 Martin Luther King Way
Oakland, CA 94609
Telephone: (510) 473-8793

Sarah Spinuzzi (Bar No. 305658)
Email: sarah@coastkeeper.org
ORANGE COUNTY COASTKEEPER
3151 Airway Avenue, Suite F-110
Costa Mesa, California 92626
Telephone: (714) 850-1965

*Attorneys for Plaintiff Orange County Coastkeeper*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORANGE COUNTY COASTKEEPER, a California non-profit corporation;<br><br>     Plaintiff,<br><br>  v.<br><br>KINGSPAN LIGHT & AIR, LLC., a Delaware limited liability company;<br><br>     Defendant. | Civil Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

Orange County Coastkeeper (hereafter "Coastkeeper" or "Plaintiff"), by and through counsel, hereby allege:

## I.   JURISDICTION AND VENUE

1.      Plaintiff brings this civil suit under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States). On June 12, 2020, Plaintiff issued a 60-day Notice of Violation and Intent To Sue letter ("Notice Letter") to Kingspan Light & Air, LLC (hereafter "Kingspan Light & Air" or "Defendant"), which is attached hereto as **Exhibit A** and fully incorporated by reference herein. The Notice Letter informed Defendant of the violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ*) ) and as amended by Order No. 2015-0122-DWQ incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use (hereinafter "Storm Water Permit") and the Clean Water Act at the subject industrial facility located at 302 E. Goetz Ave. and 401 E. Goetz Ave., Santa Ana, CA 92707 (the "Facility"). The Notice Letter informed Defendant of Plaintiff's intent to file suit against Defendant to enforce the Storm Water Permit and the Clean Water Act.

2.      The Notice Letter was also sent to the registered agent for Defendant, the Attorney General of the United States Department of Justice ("USDOJ"), the Administrator of the United States Environmental Protection Agency ("EPA"), the Acting Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional

Water Quality Control Board, Santa Ana Region ("Regional Board"), as required by 40 C.F.R. § 135.2(a)(1) and Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A).

3.      More than sixty (60) days have passed since the Notice Letter was served on Defendant and the State and Federal agencies. Plaintiff is informed and believes, and thereon alleges, that neither the EPA, USDOJ nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

4.      Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

5.      Plaintiff seeks relief for Defendant's substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from industrial activities at the Facility.

## II.   **INTRODUCTION**

6.      With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Alton Facility, pour into storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering marine and river surface waters each year. These surface waters, known as Receiving Waters, are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once-abundant and varied fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment, heavy metals, such as aluminum, iron, magnesium, chromium, copper, lead, mercury, nickel, and zinc, as well as high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The

public's use of the surface waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

7.     This complaint seeks relief for the Defendant's unlawful discharges of pollutants into waters of the United States from their industrial operations at 302 E. Goetz Ave. and 401 E. Goetz Ave., Santa Ana, CA 92707 (the "Facility"). Specifically, Defendant's discharge of pollutants from three points at the Facility to the MS4 System, which flows to the Santa Ana Delhi Channel, the Upper Newport Bay, the Lower Newport Bay, and the Pacific Ocean (collectively referred to as the "Receiving Waters") in violation of the substantive and procedural elements of the Storm Water Permit and the Clean Water Act. These violations have been occurring for at least two years from the date of the Notice Letter and are ongoing and continuous.

### III.   PARTIES

#### A.   Orange County Coastkeeper

8.     Orange County Coastkeeper ("Coastkeeper") is a non-profit public benefit corporation organized under the laws of the State of California. Orange County Coastkeeper's office is located at 3151 Airway Avenue, Suite F-110, Costa Mesa, California 92626.

9.     Coastkeeper has over 1,400 members who live and/or recreate in and around the Santa Ana Delhi Channel, Newport Bay, and the greater San Diego Creek Watershed. Coastkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of Orange County. To further these goals, Coastkeeper actively seeks federal and state agency implementation of the Clean Water Act and, when necessary, directly initiates enforcement actions on behalf of itself and its members.

10.    Members of Coastkeeper live and own homes in the Newport Bay watershed and use and enjoy the waters to which the Facility discharges storm water to participate in a variety of water sports and other activities, to view wildlife, recreate, and engage in

scientific studies including monitoring activities. Coastkeeper staff, members, and volunteers engage in Marine Protected Area monitoring activities in the Upper Newport Bay and perform eelgrass and oyster restoration activities in Newport Bay.

11.    Defendant's failure to comply with the procedural and substantive requirements of the Storm Water Permit and/or the Clean Water Act, including but not limited to discharges of polluted storm water and non-storm water from the Facility degrade water quality and harm aquatic life in the Newport Bay Watershed, and impair Coastkeeper's Members' use and enjoyment of those waters.

12.    The Facility's discharges of polluted storm water are ongoing and continuous. Thus, the interests of Coastkeeper's members have been, are being, and will continue to be adversely affected by Kingspan's failure to comply with the Clean Water Act and the Storm Water Permit. The relief sought herein will redress the harms to Coastkeeper's members caused by Defendant's activities.

13.    Continuing commission of the acts and omissions alleged herein will irreparably harm Coastkeeper's members, for which harm they have no plain, speedy, or adequate remedy at law.

## B.    The Owner and/or Operator of the Facility

1.    Plaintiff is informed and believes, and thereon alleges, that Kingspan Light & Air is a Delaware limited liability company that is registered to do business in California with California entity number 201628810144.

2.    Plaintiff is informed and believes, and thereon alleges, that Kingspan Light & Air, LLC is an operator of the Facility.

3.    Plaintiff is informed and believes, and thereon alleges, that Kingspan Light & Air has been operating the Facility since at least November 8, 2018.

4.    Plaintiff is informed and believes, and thereon alleges, that Kingspan Light & Air is an owner of the Facility.

5.    Plaintiff is informed and believes, and thereon alleges, that Kingspan Light & Air has been an owner of the Facility since at least November 8, 2018.

6.     Plaintiff is informed and believes, and thereon alleges, that the name and address of the Registered Agent is CT Corporation System, 818 W. Seventh St., Suite 930, Los Angeles CA 90017.

7.     Plaintiff refers to Kingspan Light & Air herein as the "Facility Owner and/or Operator."

## IV.   LEGAL BACKGROUND

### A.   The Clean Water Act

8.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

9.     The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

10.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

11.     The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); see 40 C.F.R. § 122.2.

12.     The term "pollutant" includes "dredged spoil, solid waste… rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

13.     "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in

interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

14.    The EPA promulgated regulations defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce. *Id.*

15.    The Clean Water Act confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

16.    A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

17.    A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

18.    Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

19.    The Defendant is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

20.    An action for injunctive relief is authorized under Section 505(a) of the CWA, 33 U.S.C. § 1365(a).

21.    Each separate violation of the Clean Water Act commencing five years prior

to the date of the Notice Letter subjects the violator to a penalty of up to $37,500 per day, pursuant to Sections 309(d) and 505 of the CWA occurring after December 6, 2013 through November 2, 2015, and $55,800 per day per violation for all violations that occurred after November 2, 2015 and were assessed on or after January 13, 2020. *See* 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

22.    Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys', experts', and consultants' fees.

### B.    California's Storm Water Permit

23.    Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. 33 U.S.C. § 1342(p).

24.    Section 402(b) of the Clean Water Act allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. *See* 33 U.S.C. § 1342(b). States with approved NPDES permit programs are authorized by section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *See id.*

25.    California is a state authorized by EPA to issue NPDES permits.

26.    In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

27.    The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to the Clean Water Act.

28.    Between 1997 and June 30, 2015, the Storm Water Permit in effect was Order No. 97-03-DWQ, which Plaintiff refers to as the "1997 Permit."

29.    On July 1, 2015, pursuant to Order No. 2014-0057-DWQ, the Storm Water

Permit was reissued, which Plaintiff refers to as the "2015 Permit."

30.    The 2015 Permit superseded the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more stringent, than the terms of the 1997 Permit. *See* 2015 Permit, Finding 6.

31.    On November 6, 2018, pursuant to Order No. 2015-0122-DWQ, the State Water Resources Control Board amended the 2015 Permit to incorporate Total Maximum Daily Load ("TMDL") implementation requirements for waterbodies subject to TMDLs with contributions from industrial dischargers ("2018 Amendment").

32.    In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit. 2015 Permit Finding #12. Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* 2015 Permit, Finding 17.

33.    Violations of the Storm Water Permit are violations of the Clean Water Act. *See* 2015 Permit, Section XXI(A) (Duty to Comply).

**C.    The Storm Water Permit Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations**

34.    The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. See 2015 Permit, Discharge Prohibition III (B).

35.    The Storm Water Permit contains Total Maximum Daily Load ("TMDL") implementation requirements for waterbodies subject to TMDLs with contributions from industrial dischargers.

36.    A TMDL is a calculation of the maximum quantity (or load) of a pollutant that may be added to a water body from all sources, including point sources, nonpoint

1    sources, aerial deposition, and natural background sources, without exceeding the

2    applicable Water Quality Standards ("WQS") for that or those pollutants. *See* 40 C.F.R. §

3    130.2(e); 33 U.S.C. § 1313(d)(1)(c); 40 C.F.R. § 130.2(e)-(i).

4        37.    A TMDL can be expressed as the sum of the wasteload allocations

5    ("WLAs") and the load allocations, plus a margin of safety. The WLA is the portion of a

6    TMDL allocated to existing and future point sources. *See* 40 C.F.R. § 130.2(h).

7        38.    On June 14, 2002 the EPA adopted the San Diego Creek and Newport Bay

8    Toxics TMDL to address water quality impairments in San Diego Creek and Newport

9    Bay due to copper, lead, zinc and other toxic pollutants ("Toxics TMDL").

10       39.    The Toxics TMDL assigns a WLA for toxic pollutants including copper,

11   lead and zinc to "Responsible Dischargers" to be met at the facility's industrial discharge

12   location(s) for discharges into Newport Bay or the San Diego Creek and its tributaries. In

13   saltwater systems like Newport Bay, the EPA used the chronic dissolved metals numeric

14   targets to develop mass-based TMDLs. *See* U.S. EPA Reg. 9, Total Maximum Daily

15   Loads For Toxic Pollutants San Diego Creek and Newport Bay, California, 42, 49.

16       40.    The numeric targets for metals in Newport Bay are not hardness dependent,

17   since it is a saltwater system, and measured as dissolved metals to be consistent with

18   CTR and concerns about metals bioavailability. The dissolved saltwater chronic targets

19   are: copper – 0.0031 mg/L; lead – 0.0081 mg/L; zinc – 0.081 mg/L. *Id.* at 42.

20       41.    The Toxics TMDLs assigned WLA for copper, lead, and zinc to Responsible

21   Dischargers to be met at the facility's industrial discharge location(s) for dischargers into

22   the Newport Bay. *See* 2015 Permit, Section VII(A)(1)-(3).

23       42.    WLA are translated into instantaneous maximum Numeric Effluent

24   Limitations ("NELs"). The instantaneous maximum NEL applicable to discharges from

25   the Kingspan Facility are: copper – 0.00578 mg/L; lead – 0.221 mg/L; zinc – 0.095 mg/L.

26   Effective July 1, 2020, Responsible Discharger with an NEL exceedance is in violation of

27   the Storm Water Permit and must take corrective action. *See* 2015 Permit, Section

28   XX(B); See 2018 Amendment, Attachment E.

43.     The Storm Water Permit Effluent Limitations require dischargers covered by the Storm Water  Permit to reduce or prevent pollutants in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), and pH. *See* 2015 Permit, Section V(A).

44.     Pursuant to the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 2015 Permit, Effluent Limitation V(A).

45.     EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks").

46.     The EPA Benchmarks provide an objective standard to determine whether a facility's BMPs are successfully developed and/or implemented. *See* MSGP, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); MSGP, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); MSGP, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

47.     The EPA Benchmarks for the following parameters are as follows: pH – 6.0 – 9.0 standard units ("s.u."); TSS – 100 mg/L; iron – 1.0 mg/L; nitrate plus nitrate as nitrogen ("N+N") – 0.68 mg/L; O&G – 15 mg/L; zinc – 0.11 mg/L; and aluminum – 0.75 mg/L. Additional EPA Benchmarks for heavy metals, which depend on the hardness of the receiving water, also apply to storm water discharges from the Facility.

48.     Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate that BMPs that meet BAT for toxic pollutants and/or BCT for conventional pollutants have not been developed and/or implemented at

the facility. *Id.*

49.     The Storm Water Permit Receiving Water Limitations prohibit storm water discharges from adversely impacting human health or the environment. *See* 2015 Permit, Section VI(B).

50.     Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of Receiving Water Limitation Section VI(B) of the 2015 Permit.

51.     The Storm Water Permit Receiving Water Limitations also prohibit storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan." *See* 2015 Permit, Receiving Water Limitation VI(A).

52.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various regional boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

53.     The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan that contains WQS for water bodies within its geographical area.

54.     WQS may be either numeric or narrative objectives. Applicable WQS include, among others, the Criteria for Priority Toxic Pollutants in the State of California, 40 C.F.R. § 131.38 ("CTR"), and water quality objectives in the Basin Plan.

55.     The Water Quality Control Plan for the Santa Ana River Basin, California Regional Water Quality Control Board, Santa Ana Region, 3rd Ed., (Rev. June 2011) ("Santa Ana Basin Plan") identifies the "Beneficial Uses" of water bodies in the Santa Ana region.

56.     The existing and/or potential Beneficial Uses for the Santa Ana Delhi Channel, into which the Facility indirectly discharges, include, at a minimum: warm freshwater habitat (WARM); water contact recreation (REC1); non-contact water recreation (REC2); wildlife habitat (WILD); and slightly downstream includes the

Beneficial Use for rare, threatened or endangered species (RARE). *See* Basin Plan at Table 3-1.

57.    The Santa Ana Delhi Channel empties to the Upper Newport Bay, which flows through the Lower Newport Bay, and discharges into the Pacific Ocean.  Upper Newport Bay, Lower Newport Bay, and the Pacific Ocean also have numerous listed Beneficial Uses including REC1, REC2; navigation (NAV); shell fish harvesting (SHELL); commercial and sportfishing (COMM); WILD; RARE; spawning reproduction and development (SPWN); estuarine habitat (EST); and marine habitat (MAR). Id.

58.    Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plans are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

59.    According to the 2016 303(d) List of Impaired Water Bodies, Newport Bay and its tributaries are impaired for several pollutants, including: copper, fecal indicator bacteria, sediment, nutrients, toxicity, DDT, PCBs, chlordane, and malathion.

60.    A "new discharger" under the Storm Water Permit is a facility that sought coverage for the first time after the Storm Water Permit's effective date and it discharges into a water body with a 303(d) list impairment. 2015 Permit, Section VII.B.

61.    New dischargers, such as the Kingspan Light and Air Facility, that discharge to a water body with a 303(d) list impairment are ineligible for coverage under the Storm Water Permit unless one of three conditions are met: 1) "the Discharger has eliminated all exposure to storm water of the pollutant(s) for which the water body is impaired, has documented the procedures taken to prevent exposure onsite, and has retained such documentation with the SWPPP at the facility; 2) the pollutant for which the water body is impaired is not present at the Discharger's facility, and the Discharger has retained documentation of this finding with the SWPPP at the facility; or, 3) the facility can demonstrate that the discharge of any listed pollutant will not cause or contribute to an exceedance of a water quality standard by showing either that the discharge complies with the water quality standard at the point of discharge or that there are sufficient

remaining waste load allocations in an approved TMDL and the discharge is controlled at least as stringently as similar discharges subject to that TMDL. *See* 2015 Permit Section VII(B).

62. Polluted discharges from industrial manufacturing facilities, such as the Facility, can contain pH-affecting substances; metals such as iron, magnesium, and aluminum; toxic metals such as lead, zinc, nickel, cadmium, chromium, copper, arsenic, and mercury; chemical oxygen demand ("COD"); biological oxygen demand ("BOD"); total suspended solids ("TSS"); total organic carbon ("TOC"); benzene; gasoline and diesel fuels; cyanide; ammonia-N; fuel additives; coolants; antifreeze; nitrate + nitrite nitrogen ("N+N"); trash; and oil and grease ("O&G"). Many of these pollutants are on the list of chemicals published by the State of California as known to cause cancer, birth defects, and/or developmental or reproductive harm.

63. The Facility's discharges of polluted storm water to the Receiving Waters pose threats to the public, dramatically affect the use and enjoyment of the surrounding environment, and adversely affect the aquatic environment.

64. WQS applicable to dischargers covered by the Storm Water Permit include, but are not limited to, those set out in the Basin Plan and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

65. The CTR establishes numeric WQS for certain toxic pollutants in California surface waters. The WQS for zinc in the CTR is 0.12 mg/L. As noted above, Newport Bay and its tributaries, including the Santa Ana Delhi Channel, are impaired for toxicity, in part due to high levels of zinc.

66. The Santa Ana Basin Plan provides that "dissolved mineral content of the waters of the region, as measured by the total dissolved solids ("TDS") test ('Standard Methods for the Examination of Water and Wastewater, 16th Ed.,' 1985: 209B (180°C), p. 95), shall not exceed the specific objectives listed in Table 4-1 as a result of controllable water quality standards." *See* Santa Ana Basin Plan, 4-10.

67. The Santa Ana Basin Plan provides that "[t]he pH of inland surface waters

shall not be raised above 8.5 or depressed below 6.5 as a result of controllable water quality factors." *See* Santa Ana Basin Plan, 4-18.

68.     The Santa Ana Basin Plan includes a toxicity standard which states that "[t]he concentrations of toxic pollutants in the water column, sediments or biota shall not adversely affect beneficial uses." *See* Santa Ana Basin Plan, 4-20.

69.     Further, the Santa Ana Basin Plan states that "[t]oxic substances shall not be discharged at levels that will bioaccumulate in aquatic resources to levels which are harmful to human health." *See* Santa Ana Basin Plan 4-20.

70.     WQS applicable to dischargers covered by the Storm Water Permit include, but are not limited to, those set out in the Santa Ana Basin Plan and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

71.     The CTR includes numeric criteria set to protect human health and the environment in the State of California. Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

72.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQS are violations of Receiving Water Limitation Section VI(A) of the 2015 Permit.

**D.     The Storm Water Permit Storm Water Pollution Prevention Plan Requirements**

73.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. 2015 Permit, Sections I(I) (Finding 54), X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. 2015 Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water

discharges. 2015 Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. 2015 Permit, Section I(D) (Finding 32), Section X(C).

74.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and their current responsibilities for developing and implementing the SWPPP. 2015 Permit, Section X.

75.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. 2015 Permit, Section X.

76.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. 2015 Permit, Section X(B). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all

Complaint for Declaratory and
Injunctive Relief and Civil Penalties     16

BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. 2015 Permit, Section XV.

77.   The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. 2015 Permit, Sections I(J) (Finding 55), X(B)(1).

**E.    The Storm Water Permit Monitoring Implementation Program Requirements**

78.   The Storm Water Permit requires permittees to develop and implement storm water Monitoring Implementation Program ("MIP") and include it in the SWPPP prior to conducting, and in order to continue, industrial activities. 2015 Permit, Sections X(I) and XI.

79.   The objective of the MIP is to detect and measure the concentrations of pollutants in a facility's discharge and to ensure compliance with the 2015 Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. See 2015 Permit, Section XI. An adequate MIP ensures that BMPs are effectively reducing and/or eliminating pollutants at the facility and is evaluated and revised whenever appropriate to ensure compliance with the Storm Water Permit. *See id.*

80.   The 2015 Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the 2015 Permit. 2015 Permit, Section XI(B).

81.   Section XI(A)(1) of the 2015 Permit requires dischargers to conduct monthly visual observations of each drainage area.

82.   Section XI(A)(2) of the 2015 Permit requires dischargers to conduct sampling event visual observations, and document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations

observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See* 2015 Permit, Section XI(A)(3).

83.   The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. 2015 Permit, Section X(B)(1).

84.   The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. 2015 Permit Section XI(B)(4).

85.   Section XI(B)(1) of the 2015 Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("QSE").

86.   Section XI(B)(2) of the 2015 Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

87.   Section XI(B)(11) of the 2015 Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via Storm Water Multiple Application & Report Tracking System ("SMARTS") within thirty (30) days of obtaining all results for each sampling event.

88.   Section XI(B)(6)(a)-(b) of the 2015 Permit requires dischargers to analyze samples for TSS, O&G, and pH, and additional parameters identified on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment – in addition to those required under the SIC code.

89.   Table 1 of the 2015 Permit requires SIC code 3442, such as this facility, to analyze samples for zinc, N+N, iron, and aluminum.

90.   Section XI(B)(6)(c) of the 2015 Permit requires dischargers to analyze samples for pollutants associated with industrial operations.

91.   Section XI(B)(6)(f) of the 2015 Permit requires dischargers to analyze

additional parameters required by the Regional Board.

92.     Section XI(B)(6) of the 2015 Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved Total Maximum Daily Loads.

93.     Section XVI of the 2015 requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the 2015 Permit, an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

**F.     The 2015 Permit Exceedance Response Actions Requirements**

94.     When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status." See 2015 Permit, Section XII(B). A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a Numeric Action Level ("NAL") exceedance for that same parameter. *See* 2015 Permit, Section XII(C).

95.     Level 1 status commences on July 1 following the reporting year during which the exceedance(s) occurred. *See* 2015 Permit, Section XII(C). By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of Storm Water Permit. *See* 2015 Permit, Section XII(C)(1)(a)-(c).

96.     Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. *See* 2015 Permit, Section XII(C)(1)(c).

97.     Based upon this Level 1 status evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation, certify and submit via SMARTS a Level 1 Exceedance Response Action ("ERA") Report prepared by a QISP that includes the a summary of the Level 1 ERA Evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL. *See* 2015 Permit, Section XII(C)(2)(a)(i)-(ii).

98.     The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. *See* 2015 Permit, Section XII(C)(2)(a)(iii).

99.     A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *See* 2015 Permit, Section XII(C)(2)(b).

100.    A permittee's Level 1 status for any given parameter shall change to Level 2 status if sampling results indicate an NAL exceedance for that same parameter while the Discharger is in Level 1. Level 2 status commences on July 1 following the reporting year during which the NAL exceedance(s) occurred. *See* 2015 Permit, Section XII(D).

101.    A Discharger in Level 2 status shall submit a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the reporting year during with the NAL exceedances occurred. On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, a Discharger shall certify and submit a Level 2 ERA Technical Report prepared by a QISP to SMARTS. *See*, 2015 Permit, Section XII(D).

## V.   FACTUAL BACKGROUND

### A.   The Facility's Storm Water Permit Coverage

102.   Plaintiff is informed and believes, and thereon alleges, that on or about November 8, 2018, Kingspan Light & Air obtained Storm Water Permit Coverage for the Facility by submitting a Notice of Intent ("NOI") to the State Board.

103.   Plaintiff is informed and believes, and thereon alleges, that in the NOI, the Facility Owner and/or Operator identified the owner/operator of the Kingspan Light & Air Facility as "Kingspan Light and Air" located at 401 East Goetz Ave., Santa Ana, California 92707.

104.   The NOI lists the Facility as 4.4 acres in size with 4.4 acres of industrial areas exposed to stormwater.

105.   The NOI states that the Facility is 95% impervious.

106.   The State Board's electronic SMARTS database lists the current Kingspan Light and Air Waste Discharge Identification ("WDID") number as 8 30I027957.

107.   SMARTS lists the Facility's coverage under the Storm Water Permit as "Active."

108.   The NOI lists the SIC code for the Facility as 3442 (Metal Doors, Sash, Frames, Molding, and Trim Manufacturing).

109.   Plaintiff is informed and believes, and thereon alleges, that the Facility is a "new discharger" under the Storm Water Permit because it sought coverage for the first time after the Storm Water Permit's effective date and it discharges into a water body with a 303(d) list impairment.

### B.   Description of Industrial Activities at the Facility

110.   Plaintiff is informed and believes, and thereon alleges, that the Facility produces unit skylights for use in industrial and commercial facilities.

111.   Plaintiff is informed and believes, and thereon alleges, that pollutants associated with operations at the Facility include, but are not limited to: heavy metals, total suspended solids ("TSS"), debris, propane, oil and grease.

112.   Plaintiff is informed and believes, and thereon alleges, that there are several industrial areas, material handling and storage areas, dust and particulate generating activities, spills, or leaks that may be exposed to storm water discharges.

113.   Plaintiff is informed and believes, and thereon alleges, that the Facility stores fiberglass insulation in the outside area to the northwest corner of the 302 E Goetz facility. This area is uncovered and can result in storm water runoff pollution from particulate debris.

114.   Plaintiff is informed and believes, and thereon alleges, that the Facility has multiple intermediate product storage areas surrounding the Facility. These areas are uncovered and can result in storm water runoff pollution from particulate debris.

115.   Plaintiff is informed and believes, and thereon alleges, that the storage and maintenance of vehicles and equipment, storage of materials, and industrial activities occur outdoors without adequate cover to prevent storm water and non-storm water exposure to pollutant sources, and without secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the Facility.

116.   Plaintiff is informed and believes, and thereon alleges, that trucks and vehicles on-site track sediment, dirt, fugitive dust, oil and grease, metal particles, and other pollutants off-site.

117.   Plaintiff is informed and believes, and thereon alleges, that the Facility also discharges non-storm water from irrigation and landscape watering drainage, fire-hydrant and fire prevention or response system flushing, and atmospheric condensate from refrigeration, air conditioning, and compressors along the main driveway and eastern property line.

118.   Plaintiff is informed and believes, and thereon alleges, the Facility's Owners' and/or Operators' failures to develop and/or implement required BMPs result in the exposure of pollutants associated with their industrial activities to precipitation, and result in the Facility's discharge of polluted storm water into Receiving Waters in

1  violation of the Storm Water Permit and the Clean Water Act.

2      119.  Plaintiff is informed and believes, and thereon alleges, the Facility's

3  Owners' and/or Operators' failures to develop and/or implement required BMPs also

4  result in discharges of prohibited non-storm water in violation of the Storm Water Permit

5  and the Clean Water Act.

6      120.  Plaintiff is informed and believes, and thereon alleges, that the activities

7  and/or areas listed in paragraphs 122-129 are industrial activities and/or areas of

8  industrial activity at the Facilities.

9  **C.  Defendant's SWPPP and MIP for the Facility**

10      121.  The SWPPP and MIP are publicly available for the Kingspan Light and Air

11  Facility via the SMARTS database and are dated December 19, 2019.

12      122.  Plaintiff is informed and believes, and thereon alleges, that the SWPPP and

13  MIP referenced in paragraph 133 are the current SWPPP and MIP for the Facility.

14  **D.  Industrial Activities, Pollutant Sources, Pollutants, and BMPs at the**

15  **Facility**

16      123.  Plaintiff is informed and believes, and thereon alleges, that the industrial

17  activities and areas of industrial activity are sources of pollutants at the Facility.

18      124.  The Kingspan Light and Air Facility's SWPPP sections entitled: "Minimum

19  Best Management Practices" and "Advanced Best Management Practices" identify the

20  BMPs for the areas of industrial activity at the Facility.

21      125.  Plaintiff is informed and believes, and thereon alleges, that the Facility's

22  SWPPP fails to describe adequate BMPs to reduce or prevent pollutants in the discharges

23  from the Facility.

24      126.  Plaintiff is informed and believes, and thereon alleges, that Kingspan's past

25  or current SWPPP does not include and/or Kingspan has not implemented adequate

26  BMPs designed to reduce pollutant levels in discharges to BAT and BCT levels in

27  accordance with the Storm Water Permit, as evidenced by the data in Exhibit A. *See* 2015

28  Permit Section X(H)(2)(a).

127.   Plaintiff is informed and believes, and thereon alleges, that Kingspan's SWPPP fails to include BMPs that meet Effluent Limitations and Receiving Water Limitations, as required by the 2015 Permit Sections(V),(VI), and (X)(H).

128.   Plaintiff is informed and believes, and thereon alleges, that Kingspan's SWPPP fails to describe each BMP being implemented at the Facility, as required by the Storm Water Permit. *See* 2015 Permit Section X(H)(4)(a).

129.   Plaintiff is informed and believes, and thereon alleges, that Kingspan's SWPPP fails to include BMPs for non-storm water discharges as required by the Storm Water Permit. *See* 2015 Permit Section IV(B)(3).

130.   Every day the Facility operates with an inadequately developed, implemented, and/or properly revised SWPPP is a separate violation of the Storm Water Permit and the Clean Water Act.

131.   Plaintiff is informed and believes, and thereon alleges, that the Kingspan Light and Air Facility has been in daily violation of the Storm Water Permit's SWPPP requirements since at least November 8, 2018.

132.   Plaintiff is informed and believes, and thereon alleges, that Kingspan entered Level Status for zinc on July 1, 2019 and submitted its Level 1 ERA Report on November 26, 2019.

133.   Plaintiff is informed and believes, and thereon alleges, that sampling results demonstrate that the Facility's discharges continue to include zinc at concentrations that exceed effluent limits and receiving water limitations.

134.   Plaintiff is informed and believes, and thereon alleges, that Kingspan's Level 1 ERA report is inadequate because, at a minimum, it fails to include BMPs that prevent future NAL exceedances.

135.   Courts have expressly held that the EPA Benchmarks are relevant objective standards for evaluating whether BMPs implemented by a permittee achieve effluent limitations. See *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F.Supp.2d 914, 924 (C.D. Cal. 2009) (holding that "EPA Benchmarks are relevant guidelines that should be

1   used to evaluate the efficacy of a facility's BMPs").

2      136.   Plaintiff is informed and believes, and thereon alleges, that storm water

3   sampling at the Facility demonstrates that the Facility's storm water discharges from the

4   Facility contain concentrations of pollutants above EPA Benchmarks, including, but not

5   limited to: aluminum, iron, zinc, and TSS.

6      137.   Plaintiff is informed and believes, and thereon alleges, that the Benchmark

7   for zinc is 0.11 mg/L, and the NAL is 0.26 mg/L. Every one of the Facility's sample

8   results exceeds both the Benchmark and NAL for zinc. *See* Exhibit A.

9      138.   Plaintiff is informed and believes, and thereon alleges, that 91% of the

10  Facility's samples exceeded the Benchmark and NAL for aluminum and iron, and 45% of

11  the samples exceeded the Benchmark and NAL for TSS. *Id.*

12     139.   Plaintiff is informed and believes, and thereon alleges, that Kingspan's

13  ongoing discharges of storm water containing levels of pollutants above EPA Benchmark

14  and NALs also demonstrate that Kingspan has not developed and implemented sufficient

15  BMPs at the Facility.

16     140.   Plaintiff is informed and believes, and thereon alleges, that the repeated and

17  significant exceedance of EPA Benchmarks demonstrate that the Facility Owner and/or

18  Operator failed and continue to fail to develop BMPs to prevent the exposure of

19  pollutants to storm water, and to prevent discharges of polluted storm water from the

20  Facility.

21     141.   Plaintiff is informed and believes, and thereon alleges, that the repeated and

22  significant exceedance of EPA Benchmarks demonstrate that the Facility Owner and/or

23  Operator failed and continue to fail to implement BMPs to prevent the exposure of

24  pollutants to storm water, and to prevent discharges of polluted storm water from the

25  Facility.

26     142.   Kingspan's failure to develop and/or implement adequate pollution controls

27  to meet BAT/BCT at the Facility violates and will continue to violate the CWA and the

28  Storm Water Permit each and every day Kingspan discharges storm water without

1  meeting BAT/BCT.

2  **E.    Discharge Locations at the Facility**

3  **a.  Discharge Locations at the Kingspan Light and Air Facility**

4  143.   The Facility Owner and/or Operator states that the Kingspan Light and Air

5  Facility's industrial storm water is discharged from 3 discharge locations, located at the

6  Southwest corner of the 302 E. Goetz Ave., Santa Ana, CA 92702 property and the

7  Southwest and Southeast corners of the 401 E. Goetz Ave., Santa Ana, CA 92702

8  property.

9  144.   The attachment to the Kingspan Light and Air Facility's SWPPP is the Site

10  Map, identified in the SWPPP as Appendix A, Figures 3 and 4, illustrating the direction

11  of sheet flow from the north (top of the map) to the southwest (lower left on the map) at

12  the 302 E. Goetz Ave., Santa Ana, CA 92702 property and from the north (top of the

13  map) to the south (bottom of the map) at the 401 E. Goetz Ave., Santa Ana, CA 92702

14  property.

15  **F.    The Discharges from the Facility to the Receiving Waters**

16  145.   Plaintiff is informed and believes, and thereon alleges, that the storm water

17  discharging from the Kingspan Light and Air Facility flows into the Santa Ana municipal

18  separate storm sewer system ("MS4").

19  146.   Plaintiff is informed and believes, and thereon alleges, that the polluted

20  storm water from the Kingspan Light and Air Facility discharges from the MS4 to the

21  Santa Ana Delhi Channel and the Upper and Lower Newport Bays.

22  147.   Plaintiff is informed and believes, and thereon alleges, that the polluted

23  storm water from the Kingspan Light and Air Facility discharges from the Lower

24  Newport Bay to the Pacific Ocean.

25  148.   Plaintiff is informed and believes, and thereon alleges, that each of the

26  receiving waters described in paragraphs 146 and 147 are waters of the United States.

27  149.   In addition to implementing technology-based controls, the Storm Water

28  Permit and the Clean Water Act prohibit storm water discharges and authorized non-

storm water discharges that cause or contribute to an exceedance of an applicable water quality standards ("WQS"). *See* 2015 Permit Section VI(A); 33 U.S.C. § 1311 (b)(l)(C); 40 C.F.R. §§ 122.4(d), 122.4(i), 122.44(d).

150.   Applicable WQS include, among others, the Criteria for Priority Toxic Pollutants in the State of California, 40 C.F.R. § 131.38 ("CTR"), and water quality objectives in the Basin Plan.

151.   The CTR establishes numeric WQS for certain toxic pollutants in California surface waters. The WQS for zinc in the CTR is 0.12 mg/L. As noted above, Newport Bay and its tributaries, including the Santa Ana Delhi Channel, are impaired for toxicity, in part due to high levels of zinc. Kingspan's stormwater discharges consistently contain concentrations of zinc in excess of the numeric WQS established in the CTR and, thus, contribute to the violation of the WQS in the Receiving Waters.

152.   The Basin Plan also includes applicable narrative WQS. *See*, generally, Basin Plan, Ch. 4.

153.   The Basin Plan states that "[t]oxic substances shall not be discharged at levels that will bioaccumulate in aquatic resources to levels which are harmful to human health" and that "[t]he concentrations of toxic pollutants in the water column, sediments or biota shall not adversely affect beneficial uses." *See* Basin Plan 4-20.

154.   Plaintiff is informed and believes, and thereon alleges, the Facility's discharges include zinc that contribute to the impairment of the Receiving Waters and cause exceedances of these narrative WQS. These discharges also adversely impact human health or the environment, in violation of Receiving Water Limitation VI(B) of the Storm Water Permit.

155.   Each time discharges of storm water from the Facility cause or contribute to a violation of an applicable WQS is a separate and distinct violation of Receiving Water Limitation VI(A) of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

156.   Each time discharges from the Facility adversely impact human health or the

environment is a separate and distinct violation of Receiving Water Limitation VI(B) of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

157.   Plaintiff is informed and believes, and thereon alleges, that Kingspan has discharged storm water containing excessive levels of pollutants from the Facility during at least every significant local rain event over 0.1 inches occurring since November 8, 2018.

158.   Plaintiff is informed and believes, and thereon alleges, that Kingspan Light and Air is a "new discharger" under the 2015 Permit because it sought coverage under the Storm Water Permit for the first time after its effective date.

159.   Plaintiff is informed and believes, and thereon alleges, that Kingspan discharges into Newport Bay and its tributaries, which are impaired for several pollutants, including: copper, fecal indicator bacteria, sediment, nutrients, toxicity, DDT, PCBs, chlordane, and malathion.

160.   Kingspan's SWPPP, despite these facts, asserts that it is eligible for coverage because "it has been determined that the facility will not contribute to the impairments of its HUC-10 or receiving waters." *See* SWPPP, p. 3-3.

161.   As discussed above, each storm water discharge Kingspan has sampled has shown levels of zinc above numeric WQS. Because the Receiving Waters are impaired for toxicity due to, among other pollutants, high levels of zinc, the Facility's discharges "cause or contribute to an exceedance of a water quality standard."

162.   Plaintiff is informed and believes, and thereon alleges, that each day since November 8, 2018, Kingspan has violated the requirements governing new dischargers.

### G.   Defendant's Sampling, Monitoring, and Reporting

163.   The Storm Water Permit requires permittees to "collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30). *See* 2015 Permit Section XI(B)(2).

164.   Plaintiff is informed and believes, and thereon alleges, that Kingspan has

sampled storm water only once during the second half of 2018, once during each of the first and second halves of 2019, and once during the first half of 2020, despite the occurrence of at least two qualified storm events (QSEs) during those periods.

165.   By failing to sample in accordance with Section XI(B)(2) of the Storm Water Permit violates both the Clean Water Act and the Storm Water Permit.

166.   Kingspan Light and Air's SWPPP section entitled "Sampling Procedures" constitutes the "Sampling Program" for the Facility.

167.   Via the SMARTS database, Plaintiff obtained an Annual Report for the Kingspan Light and Air Facility dated July 11, 2019.

168.   Plaintiff is informed and believes, and thereon alleges, that the Annual Report dated July 11, 2019, obtained from the Regional Board is the 2018/2019 Annual Report for the Kingspan Light and Air Facility.

169.   Via the SMARTS database, Plaintiff obtained an Annual Report for the Kingspan Light and Air Facility dated July 15, 2020.

170.   Plaintiff is informed and believes, and thereon alleges, that the Annual Report dated July 15, 2020, obtained from the Regional Board is the 2019/2020 Annual Report for the Kingspan Light and Air Facility.

171.   Via the SMARTS database, Plaintiff obtained a Level 1 ERA Report for the Kingspan Light and Air Facility dated November 26, 2019.

172.   Plaintiff is informed and believes, and thereon alleges that the Level 1 ERA Report dated November 26, 2019, obtained from the Regional Board is the Level 1 ERA report for the Kingspan Light and Air Facility.

173.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to collect and/or analyze storm water samples from at least four QSEs during the 2018/2019 reporting year.

174.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator erroneously certified that the Facility was in compliance with the Storm Water Permit in its 2018/2019 Annual Report.

175.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator's certification of compliance in the 2018/2019 Annual Report was false because it failed to comply with each of the requirements of the 2015 Permit.

176.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to describe instances of noncompliance with the Storm Water Permit at the Facility in its 2018/2019 Annual Report.

177.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to collect and/or analyze storm water samples from at least four QSEs during the 2019/2020 reporting year.

178.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator erroneously certified that the Facility was in compliance with the Storm Water Permit in its 2019/2020 Annual Report.

179.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator's certification of compliance in the 2019/2020 Annual Report was false because it failed to comply with each of the requirements of the 2015 Permit.

180.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to describe instances of noncompliance with the Storm Water Permit at the Facility in its 2019/2020 Annual Report.

181.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator entered Level 1 status on July 1, 2019 for Aluminum, Iron, and Zinc based on the storm water samples collected in the 2018/2019 year.

182.   Plaintiff is informed and believes, and thereon alleges, that sampling taken since submitting the Level 1 Era Report demonstrates that the Facility's discharges continue to include zinc at concentrations that exceed effluent limits and receiving water limitations.

183.   Plaintiff is informed and believes, and thereon alleges, that Kingspan's Level 1 ERA Report is inadequate because, at a minimum, it fails to include BMPs that prevent future NAL exceedances.

184.   Plaintiff is informed and believes, and thereon alleges, that Kingspan has been in violation of these requirements since November 8, 2018.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Violation of Section 301(a) of the Clean Water Act by Discharging Contaminated Storm Water in Violation of the Storm Water Permit's Effluent Limitations.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

185.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

186.   Plaintiff is informed and believes, and thereon alleges, that Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

187.   Plaintiff is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility.

188.   Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the CWA. 2015 Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

189.   The Facility Owner and/or Operator violated, violate and will continue to violate the Storm Water Permit Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

190.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator violated the Effluent Limitations of the Storm Water Permit and

the Clean Water Act within the applicable statute of limitations, and such violations are ongoing and continuous.

191.   Each and every violation of the Storm Water Permit Effluent Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

192.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator are subject to an assessment of civil penalties for each and every violation of the CWA occurring from November 8, 2018 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

193.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff have no plain, speedy, or adequate remedy at law.

194.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## SECOND CAUSE OF ACTION

**Defendant's Discharges of Contaminated Storm Water in Violation of Storm Water Permit Receiving Water Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

195.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

196.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from the Facility.

197.   Plaintiff is informed and believes, and thereon alleges, that within the applicable statute of limitations, storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards has discharged and continues to discharge each time storm water discharges from the Facility.

198.   The Facility Owner and/or Operator violated, violate and will continue to violate the Storm Water Permit Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS, discharges from the Facility.

199.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator's violated and violate the Receiving Water Limitations of the Storm Water Permit and the CWA within the applicable statute of limitations, and such violations are ongoing and continuous.

200.   Each and every violation, within the applicable statute of limitations, of the Storm Water Permit Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

201.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator are subject to an assessment of civil penalties for each and every violation of the CWA occurring from November 8, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

202.   An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

203.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### THIRD CAUSE OF ACTION

**Defendant's Failure to Adequately Develop, Implement, and/or**

**Revise a Storm Water Pollution Prevention Plan in Violation of the**

**Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

204.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

205.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that the Facility Owner and/or Operator have failed and continues to fail to develop an adequate SWPPP for the Facility, in violation of the Storm Water Permit.

206.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that the Facility Owner and/or Operator have failed and continue to fail to adequately implement the SWPPP for the Facility, in violation of the Storm Water Permit.

207.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Facility Owner and/or Operator have failed and continue to fail to adequately revise the SWPPP for the Facility, in violation of the Storm Water Permit.

208.   The Facility Owner and/or Operator have been in violation of the Storm Water Permit at the Facility every day from November 8, 2018, to the present.

209.   The Facility Owners' and/or Operators violations of the Storm Water Permit and the CWA at the Facility are ongoing and continuous.

210.   The Facility Owner and/or Operator will continue to be in violation of the Storm Water Permit and the CWA each and every day the Facility Owner and/or Operator fails to adequately develop, implement, and/or revise the SWPPP for the Facility.

211.   Each and every violation of the Storm Water Permit SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

212.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator are subject to an assessment of civil penalties for each and every violation of the CWA occurring from November 8, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

213.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

214.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against the Defendant as set forth hereafter.

## FOURTH CAUSE OF ACTION

**Defendant's Failure to Report as Required by the Storm Water Permit in Violation of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

215.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

216.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owners/Operators have failed and continue to fail to sufficiently sample and analyze storm water in violation of Section XI(B)(2) and (B)(6) of the 2015 Permit.

217.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owners/Operators have failed and continue to fail to submit accurate Annual Reports to the Regional Board, in violation of Sections XI and XVI of the 2015 Permit.

218.   Plaintiff is informed and believes, and thereon alleges, that the Facility

Owners/Operators failed and continue to fail to submit adequate ERA Reports to the Regional Board for the Facility with BMP upgrades that meet BAT/BCT, in violation of Section XII(C) of the 2015 Permit.

219.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owners'/Operators' Annual Reports failed and continue to fail to meet the monitoring and reporting requirements of the Storm Water Permit, in violation of Sections XI and XVI of the 2015 Permit.

220.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators of the Facility have failed and continue to fail to submit complete Annual Reports to the Regional Board, in violation of Sections XI and XVI of the 2015 Permit.

221.   The Facility Owners/Operators have been in violation of Sections XI, XII and XVI of the 2015 Permit since November 8, 2018.

222.   The Facility Owners/Operators have been in violation of the reporting requirements of the Storm Water Permit each day it has operated the Facility without reporting as required by Receiving Water Limitations in Sections XI, XII(C) and XVI of the 2015 Permit.

223.   The Owners/Operators have been in violation of Sections XI, XII(C) and XVI of the 2015 Permit since November 8, 2018.

224.   The Owners'/Operators' violations of the reporting requirements of the 2015 Permit and the CWA are ongoing and continuous.

225.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator are subject to an assessment of civil penalties for each and every violation of the CWA occurring from November 8, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

226.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of

California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

227.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## FIFTH CAUSE OF ACTION

**Defendant's Failure to Adequately Develop, Implement, and/or**

**Revise a Monitoring Implementation Plan in Violation of**

**the Storm Water Permit and the Clean Water Act.**

**U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

228.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

229.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop and implement an adequate MIP for the Facility, in violation of the Storm Water Permit.

230.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately revise a MIP for the Facility, in violation of the Storm Water Permit.

231.   The Owners/Operators have been in violation of the Storm Water Permit's monitoring requirements at the Facility every day from November 8, 2018 to the present.

232.   The Owners'/Operators' violations of its Storm Water Permit's monitoring requirements and the CWA at the Facility are ongoing and continuous.

233.   The Owners/Operators will continue to be in violation Section XI of the 2015 Permit, and the CWA each and every day they fail to adequately develop, implement, and/or revise an MIP for the Facility.

234.   Each and every violation of the Storm Water Permit's MIP requirements at the Facility is a separate and distinct violation of the CWA.

235.   By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA

occurring from November 8, 2018 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

236.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Coastkeeper, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

237.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays judgment against the Defendant as set forth hereafter.

## VII.    RELIEF REQUESTED

Plaintiff respectfully requests that this Court grant the following relief:

a.    A Court order declaring the Defendant to have violated and to be in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b); for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent limitations which include BAT/BCT requirements, for failing to meet receiving water limitations, for failure to develop and implement an adequate SWPPP, for failure to submit accurate annual reports, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit.

b.    A Court order requiring Defendant to implement affirmative injunctive measures designed to eliminate Defendant's violations of the substantive and procedural requirements of the Storm Water Permit and the Clean Water Act;

c.    A Court order assessing civil monetary penalties for each violation of the CWA at $37,500.00 per violation per day, pursuant to Sections 309(d) and 505 of the CWA occurring after December 6, 2013 through November 2, 2015, and $55,800 per day per violation for all violations that occurred after November 2, 2015 and were assessed

on or after January 13, 2020. *See* 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

      d.    A Court order awarding Plaintiff its reasonable costs of suit, including attorneys', witness, experts', and consultants' fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

      e.    Any other relief as this Court may deem appropriate.


Dated: August 12, 2020               Respectfully submitted,


By _____
        Anthony M. Barnes
        Erica A. Maharg
        Attorney for Plaintiffs
        Orange County Coastkeeper